1  Paul R. Kiesel, State Bar No. 119854
        *kiesel@kiesel.law*
2  Melanie Meneses Palmer, State Bar No. 286752
        *palmer@kiesel.law*
3  **KIESEL LAW LLP**
4  8648 Wilshire Boulevard
5  Beverly Hills, California 90211-2910
   Tel:    310-854-4444
6  Fax:   310-854-0812
7
8  Attorneys for Plaintiff
   Corey Westgate
9
10              UNITED STATES DISTRICT COURT
11              CENTRAL DISTRICT OF CALIFORNIA
12
13  COREY WESTGATE,                    Case No.  2:18-cv-03431-DSF-RAO
14          Plaintiff,                 **FIRST AMENDED COMPLAINT
15                                      FOR DAMAGES**
        v.
16                                      1.  Negligence
17  COLOPLAST CORP., a Delaware        2.  Strict Liability: Failure To Warn
    corporation; COLOPLAST A/S;        3.  Breach of Express Warranties
18  COLOPLAST MANUFACTURING            4.  Breach of Implied Warranties
    US, LLC, a Minnesota corporation; and  5.  Common Law Fraud
19  DOES 1 through 10, inclusive,      6.  Negligent Misrepresentation
20                                     7.  Violation of Applicable State
21          Defendants.                    Consumer Fraud & Deceptive Trade
                                           Practices Laws
22
23                                      **DEMAND FOR JURY TRIAL**
24
25
26
27
28

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

---

**FIRST AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

## INTRODUCTION

Plaintiff, by her undersigned counsel, brings this Complaint against Coloplast A/S, Coloplast Corp., and Coloplast Manufacturing US, LLC (collectively referred to herein as "Defendants") related to the design, manufacture, marketing, distribution and sale of Defendants' Pelvic Mesh Product implanted in Plaintiff. This action is for compensatory, equitable, injunctive, and declaratory relief. Plaintiff makes the following allegations based upon her individual personal knowledge as to her own acts, and upon information and belief, as well as upon her attorneys' investigative efforts as to Defendants' actions and misconduct and alleges as follows.

## PARTIES

1. Plaintiff Corey Westgate is a resident and citizen of Palos Verdes Peninsula, Los Angeles County, California. Plaintiff has suffered and continues to suffer significant injury as a result of Defendants' products and the conduct alleged herein.

2. Defendant Coloplast A/S is a corporation organized and existing under the laws of the Kingdom of Denmark, maintaining its principal place of business at Holtedam 1, DK-3050 Humlebaek, Kingdom of Denmark, and maintaining its North American principal place of business at 1601 West River Road North, Minneapolis, Minnesota 55411. Coloplast A/S moved its North America Headquarters to Minneapolis in June 2006.

3. Defendant Coloplast Corp. is a corporation organized and existing under the laws of the state of Delaware maintaining its principal place of business at 1601 West River Road North, Minneapolis, Minnesota 55411. Coloplast Corp. is a wholly owned U.S. sales and marketing subsidiary of Coloplast A/S.

4. Defendant Coloplast Manufacturing US, LLC is a limited liability corporation organized and existing under Minnesota law maintaining its principal place of business as 1940 Commerce Drive, North Mankato, Minnesota 56002. Its

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

registered office is 5600 Park Street, #6, St. Paul, Minnesota 55103. Coloplast Manufacturing US, LLC is a wholly owned subsidiary of Coloplast Corp.

5.    All acts and omissions of the Coloplast Defendants as described herein were done by their agents, servants, employees, and / or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership.

6.    The true names or capacities, whether individual, corporate, associate, or otherwise of Defendants DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiff who, therefore, sues said defendants by such fictitious names. Plaintiff is informed, believes, and thereupon alleges that each defendant designated herein by a fictitious name is in some manner legally responsible for the events and happenings herein referred to, and proximately caused foreseeable damages to Plaintiff as alleged herein. Plaintiff will seek leave of Court to amend this Complaint when the names of said DOE defendants are ascertained.

7.    As used herein, "Defendants" includes all named Defendants and DOES 1-10, inclusive.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action by virtue of 28 U.S.C. § 1332, in that the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest and costs and because there is a complete diversity of citizenship between Plaintiff and Defendants.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) by virtue of the fact that Defendants are doing business in this judicial district, subjecting Defendants to personal jurisdiction in this action and making it a "resident" of this judicial district.

10.    Plaintiff was implanted with vaginal mesh products designed, manufactured, distributed, and sold in interstate commerce, including California.

11.    At all relevant times, Defendants expected or should have expected their acts would have consequences within the United States of America and in the

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

1   District of California, in particular.

2   12.   Plaintiff is unaware of the true names and capacities, whether

3   corporate, individual, associate, or otherwise of the other defendants, and therefore

4   sues these defendants by fictitious names Doe 1 through 100, inclusive, pursuant to

5   California Code of Civil Procedure § 474. When Plaintiff ascertains the identities

6   and exact nature of such fictitious defendants, Plaintiff will seek leave of this Court

7   to amend this Complaint to assert the true names thereupon.

8   **FACTUAL ALLEGATIONS**

9   13.   At all relevant times, Defendants were in the business of developing,

10   designing, licensing, distributing, selling, marketing, advertising, and delivering,

11   and introducing into interstate commerce including, inter alia, within the United

12   States and, specifically, within the State of California either directly or indirectly

13   through third parties, subsidiaries or related entities, transvaginal mesh.

14   14.   The Defendants transvaginal mesh products include those known as T-

15   Sling-Universal Polypropylene Sling, Aris-Transobturator Sling System, Supris-

16   Suprapubic Sling System, Novasilk-Synthetic Flat Mesh, Exair-Prolapse Repair

17   System, Restorelle, Smartmesh, Omnisure, Altis Single Incision Sling, Minitape as

18   well as any variations of these products and any unnamed Coloplast pelvic mesh

19   product designed and sold for similar purposes, inclusive of the instruments and

20   procedures for implementation.

21   15.   At all relevant times, transvaginal mesh was used to treat pelvic organ

22   prolapse and stress urinary incontinence.

23   16.   Stress urinary incontinence ("SUI") is the involuntary loss of urine

24   during movement that puts pressure on the bladder, such as laughing, coughing, or

25   sneezing, or during aerobic or strenuous exercise. Although incontinence is suffered

26   by men and women, it is more common in women and is typically the result of

27   menopause, or physical changes that occur to the body during pregnancy or

28   childbirth.  It affects 20-40% of all women.

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

17.   Childbirth, for example, can injure the pelvic floor muscles and ligaments that help support a woman's bladder. If these structures weaken, the bladder can move downward, pushing slightly out of the bottom of the pelvis toward the vagina. The movement of the bladder, or other pelvic organs, such as the urethra, cervix or rectum, is commonly known as pelvic organ prolapse ("POP").  More than one pelvic organ can prolapse at the same time.  Organs that can be involved in a pelvic organ prolapse include the bladder, the uterus, the bowel and the rectum. Stress urinary incontinence is a type of incontinence caused by leakage of urine during moments of physical stress.

18.   Both SUI and POP are, in most cases, treatable. A woman who elects to have her SUI or POP surgically treated has several options. SUI, for example, can be corrected through traditional abdominal surgery using sutures to attach the urethra to a ligament in the pelvis (known as the "Burch procedure"). SUI can also be surgically addressed using synthetic materials such as suprapubic mid-urethral "Slings" placed under the urethra to provide support. Similarly, POP can be corrected through traditional procedures via abdominal or transvaginal surgery. POP can also be surgically addressed using biologic, composite, or synthetic materials.

19.   Surgical mesh, including transvaginal mesh, is a medical device that is generally used to repair weakened or damaged tissue. It is made from porous absorbable or non-absorbable synthetic material or absorbable biologic material. In urogynecologic procedures, surgical mesh is permanently implanted to reinforce the weakened vaginal wall to repair pelvic organ prolapse or to support the urethra to treat urinary incontinence. Most transvaginal mesh is comprised of non-absorbable synthetic polypropylene.

20.   Upon information and belief, the Pelvic Mesh Product implanted in Plaintiff, the Altis Single Incision Sling, is comprised of a synthetic, petroleum-based mesh.

21.   Despite claims that polypropylene mesh is inert, the scientific evidence

shows that this material as implanted in the Plaintiff is biologically incompatible with human tissue and when used as a woven or knitted alloplastic textile prosthetic mesh for pelvic floor repair, polypropylene and other surgical polymers promote a severe foreign body reaction and chronic inflammatory response in a large subset of the population implanted with Defendants' Pelvic Mesh Products. This "host defense response" by a woman's pelvic tissues promotes degradation of the polypropylene mesh and the pelvic tissue, and causes chronic inflammation of the pelvic tissue, shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response and chronic pain. It also can cause new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the mesh.

22. When these Pelvic Mesh Products are inserted in the female body according to the manufacturers' instructions, it creates a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities.

23. In 1996, the FDA cleared the first mesh product for use in the treatment of stress urinary incontinence (SUI). These products include transvaginal mesh manufactured, marketed, and distributed by Defendants. These products are approved by the FDA under the abbreviated 510k approval process.

24. On February 8, 2001, Mentor announced the purchase of Porges S.A., a subsidiary of Sanofi-Synthelabo. At the time, Porges held the leading market share for urological products in France and held a strong position throughout Europe was one of the largest manufacturers of urological products, supplying a complete range of products including pelvic mesh products.

25. In May 2005, Mentor announced the U.S. launch of its new Aris (TM) Trans-Obturator Tape. According to Mentor's launch reports, "specifically designed to utilize Mentor's patented Trans-Obturator Technique (T.O.T.(TM)), Aris represents the newest technical achievement and advanced generation of trans-

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

obturator slings for the treatment of stress urinary incontinence in women." "The introduction of Aris furthers Mentor's position as a pioneer of the trans-obturator method for treating stress incontinence in women," commented Joshua H. Levine, President and Chief Executive Officer of Mentor Corporation. "We are committed to driving innovation in the field of women's health to provide better solutions for physicians and the patients they serve." Analytic Biosurgical Solutions ("ABISS") FDA registration lists its proprietary device as "Mentor Aris Trans-Obturator Tape and Surgical Kit."

26. On October 12, 2005, ABISS and Mentor entered into a number of agreements pursuant to which ABISS licensed a number of ABISS' products to Mentor, which were thereafter marketed by Mentor under its trademarks, including its Aris trademark. On June 2, 2006, Mentor sold its surgical, urological, clinical and consumer healthcare business segments to Coloplast for $461,145,398, including inter alia, Mentor's October 12, 2005 agreements with ABISS and Mentor's Aris and Novasilk Pelvic Mesh Products.

27. At all times, the product marketed and sold in the United States as "Mentor Aris Trans-Obturator Tape and Surgical Kit" was manufactured by ABISS and, at all times after October 2, 2006, the product "Mentor Aris Trans-Obturator Tape and Surgical Kit" was exclusively marketed and sold in the United States by Coloplast Corp. from its principal place of business in Minneapolis, Minnesota.

28. ABISS is registered with the FDA, Registration Number 3004756681, as the manufacturer of "Mentor Aris Trans-Obturator Tape and Surgical Kit."

29. On December 5, 2005, Mentor obtained 510(k) clearance for Mentor NovaSilk Mesh. Mentor NovaSilk Mesh is a permanent, synthetic knitted propylene mesh that is square in shape and is a sterile, single use device. The Mentor NovaSilk Mesh obtained 510(k) clearance based on substantial equivalence in material, function, performance, and design to the Gynemesh Prolene Soft (Polypropylene) Mesh cleared under 510(k) K013718 and knitted polypropylene

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

already in use under Mentor's Aris Sling cleared under 510(k) K050148.  Joshua H. Levine, President and Chief Executive Officer of Mentor Corporation commented, "The addition of NovaSilk to Mentor's expanding portfolio of women's health products for pelvic organ prolapse or stress urinary incontinence reinforces the commitment of our urology franchise to surgeons and the patients they serve by providing high quality product offerings and customer service and support."

30.    Coloplast Corp.'s annual report for 2009-2010 reported that "the majority of our acquired patents and trademarks are associated with the acquisition of Mentor's urology, business in 2006."  The annual report also said that Mentor signed "a non-competition clause prohibiting Mentor (the seller) from selling urology products for the next seven years…."

31.    Coloplast Corp. began marketing the Exair Prolapse Repair System in May 2009 to treat pelvic organ prolapse. This product is made of NovaSilk Mesh, precut into the necessary shape with four mesh arms extending from the main body, which are used to implant the device.  This product obtained 510(k) clearance based on its substantial equivalence with Coloplast Corp.'s (formerly Mentor's) NovaSilk Mesh, and Gynecare Prolift Total Pelvic Floor Repair System cleared under pre-market notification number K071512 on May 15, 2008.

32.    Coloplast A/S received 510(k) clearance for the Supris Retropubic Sling System 510(k) K111233 in June 2011, as a device substantially equivalent to the Mentor Aris Suprapubic Surgical Kit.

33.    On October 29, 2010, Coloplast Corp. acquired Mpathy Medical Devices, Inc. ("Mpathy").  Mpathy was founded in 2003, with the aim of developing less invasive surgical solutions for the treatment of female stress urinary incontinence and pelvic organ prolapse.  Mpathy's core product lines included Minitape® and Omnisure® for stress urinary incontinence, and the Restorelle® family for pelvic organ prolapse.  Defendant Coloplast Corp. said of the acquisition that Coloplast Corp.'s market position in Surgical Urology and Female Pelvic

FIRST AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

Health would immediately strengthen based on Mpathy's product portfolio including slings, mini-slings and meshes for stress urinary incontinence and pelvic floor repair and material portfolio including Smartmesh® technology.

34.   On November 5, 2012, Coloplast A/S received clearance for the Altis Single Incision Sling System (K121562) as a device substantially equivalent in performance, indications, design, and materials to Coloplast's Aris System (previously Mentor's), American Medical System's MiniArc System, and C.R. Bard Ajust Adjustable Single Sling Incision.

35.   Coloplast's website describes its various products, including those for treating (i) "Pelvic Organ Prolapse" and (ii) "Stress Urinary Incontinence", including "Sling Procedures."   A press release issued by Coloplast described Coloplast's new corporate headquarters at 1601 West River Road in Minneapolis and stated that "Denmark-based Coloplast… selected north Minneapolis as the new home for its North American headquarters in 2006."   According to the press release the new headquarters "will include one of the company's three global Innovation Centers."

36.   On July 13, 2011, the FDA issued a new warning regarding serious complications associated with transvaginal mesh, manufactured, marketed, and distributed by Defendants.   In this warning, the FDA indicated that serious complications associated with the transvaginal mesh were not rare, which was a change from what the FDA reported in October 2008.   The FDA had also received increased reports of complications associated with the transvaginal mesh in both pelvic organ prolapse and stress urinary incontinence cases.

37.   On August 25, 2011, Public Citizen, a consumer advocacy group, submitted a petition to the FDA seeking to ban the use of transvaginal mesh products in pelvic repair procedures.   In its Petition, Public Citizen warned that the transvaginal mesh should be recalled because it offers no significant benefits but exposes patients to serious risks and the potential for permanent life-altering harm.

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

Joining Public Citizen as co-petitioners were Dr. L. Lewis Wall, a professor of obstetrics and gynecology at Washington University in St. Louis, Missouri, and Dr. Daniel S. Elliott, a urologic surgeon specializing in female urology at the Mayo Clinic in Rochester, Minnesota.

38.     Defendants knew or should have known that the Products unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.   At the time Defendants began marketing each of its Pelvic Mesh Products, Defendants were aware that its Pelvic Mesh Products were associated with each and every one of the adverse events communicated by the FDA in its July 13, 2011, safety communication.   Despite claims that polypropylene mesh is inert, the scientific evidence shows that this material as implanted in the relevant female Plaintiff is biologically incompatible with human tissue and when used as a woven or knitted alloplastic textile prosthetic mesh for pelvic floor repair, polypropylene and other surgical polymers promote a severe foreign body reaction and chronic inflammatory response in a large subset of the population implanted with Defendants' Pelvic Mesh Products.   This "host defense  response" by a woman's pelvic tissues promotes degradation of the polypropylene mesh and the pelvic tissue, causes chronic inflammation of the pelvic tissue, causes shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response and chronic pain, cause new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the polypropylene mesh.

39.     The Defendants have marketed and sold the vaginal mesh products to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and include the provision of valuable cash and non-cash

10

benefits to health care providers. Also utilized are documents, patient brochures, and websites, offering exaggerated and misleading expectations as to the safety and utility of the vaginal mesh products.

40.     Contrary to the Defendants' representations and marketing to the medical community and to the patients themselves, the Defendants' vaginal mesh products have high failure, injury, and complication rates, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including the Plaintiff, making them defective under the law.

41.     Defects stem from any or all of the following:

a.  the use of polypropylene material in the mesh itself and the immune reaction that results, causing adverse reactions and injuries;

b.  the design of the vaginal mesh devices to be inserted transvaginally into an area of the body with high levels of bacteria, yeast, and fungus that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c.  biomechanical issues with the design of the mesh that create strong amounts of friction between the mesh and the underlying tissue that subsequently cause that tissue to degrade resulting in injury;

d.  the use and design of anchors in the vaginal mesh products which when placed correctly are likely to pass through and injure major nerve routes in the pelvic region;

e.  degradation of the mesh itself over time which causes the internal tissue to degrade resulting in injury;

f.  the welding of the mesh itself during production which creates a toxic substance that contributes to the degradation of the mesh and host tissue alike; and

g.  the design of trocars, as devices to insert the vaginal mesh products

**FIRST AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

into the vagina, are defective because the device requires tissue penetration in nerve rich environments which results frequently in the destruction of nerve endings causing pain and other injuries

42.     Defendants have known that some of the predicate products for the vaginal mesh products had high failure and complication rates, resulting in the recall of some of these predicate devices; that there were and are differences between the Defendants' vaginal mesh products and some or all of the predicate products, rendering them unsuitable for designation as predicate products; that significant differences exist and existed between the vaginal mesh products and their predecessor and predicate products, such that the disclosures to the FDA were and are incomplete and misleading; and that the vaginal mesh products were and are causing numerous patients severe injuries and complications.   Defendants suppressed this information and failed to accurately and completely disseminate or share this and other critical information with the FDA, health care providers, or the patients. As a result, the Defendants actively and intentionally misled and continue to mislead the public, including the medical community, health care providers and patients, into believing that the vaginal mesh products and the procedures for implantation were and are safe and effective, leading to the prescription for and implantation of the vaginal mesh products into the Plaintiffs.

43.     Feasible and suitable alternative designs as well as suitable alternative procedures and instruments for implantation have existed at all times relevant as compared to the Defendants' vaginal mesh products.  The vaginal mesh products were at all times utilized and implanted in a manner foreseeable to the Defendants, as Defendants generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physicians.

44.     Defendants provided incomplete, insufficient, and misleading training and information to physicians, in order to increase the number of physicians utilizing the vaginal mesh products, and thus increase the sales of the vaginal mesh

products, and also leading to the dissemination of inadequate and misleading information to patients, including Plaintiff.

45.     The vaginal mesh products implanted into the Plaintiff were in the same or substantially similar condition as they were when they left the possession of Defendants, and in the condition directed by and expected by the Defendants.

46.     The injuries, conditions, and complications suffered by women who have been implanted with Defendants' vaginal mesh products include but are not limited to mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, chronic pelvic pain, urinary and fecal incontinence, prolapse of organs, and in many cases the women have been forced to undergo intensive medical treatment, including but not limited to operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

47.     The medical and scientific literature studying the effects of polypropylene vaginal mesh, like Defendants' vaginal mesh products, have examined each of these injuries, conditions, and complications and determined that they are in fact casually related to the mesh itself.

48.     Defendants misrepresented to the medical and healthcare community, to Plaintiff, the FDA, and the public that the vaginal mesh products had been tested and were found to be safe and effective for the purposes of treating incontinence and/or prolapse.

49.     These representations were made by Defendants with the intent of inducing the medical community, Plaintiff, and the public, to recommend, prescribe, dispense, and purchase the vaginal mesh products for use as a means of treatment

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

for stress urinary incontinence and/or prolapse, all of which evinced an indifference to the health, safety, and welfare of Plaintiff.

50.   Defendants failed to undertake its duties to properly know the qualities of its vaginal mesh products and in representations to Plaintiffs and/or their healthcare providers, and concealed and intentionally omitted the following material information:

    a.  That Defendants' vaginal mesh products were not as safe as other products and procedures available to treat incontinence and/or prolapse;

    b.  That the risk of adverse events with Defendants' vaginal mesh products was higher than with other products and procedures available to treat incontinence and/or prolapse;

    c.  That the risk of adverse events with Defendants' vaginal mesh products were not adequately tested and were known by Defendants;

    d.  That the limited clinical testing revealed its vaginal mesh products had a higher risk of adverse effects, in addition to, and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

    e.  That Defendants failed to follow up on the adverse results from clinical studies and buried and/or misrepresented those findings;

    f.  That Defendants were aware of dangers in its vaginal mesh products in addition to and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

    g.  That its vaginal mesh products were dangerous and caused adverse side effects, including but not limited to higher incidence of erosion

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

FIRST AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

and failure, at a much more significant rate than other products and procedures available to treat incontinence and/or prolapse;

h. that patients needed to be monitored more regularly than usual while using Defendants' vaginal mesh products and, in the event the vaginal mesh products needed to be removed, that the procedures to remove them had a very high failure rate and/or needed to be performed repeatedly;

i. That Defendants' vaginal mesh products are defective in shape, composition, weight, physical, chemical and mechanical properties and are inappropriately engineered for use in the female pelvis;

j. That the mesh material is not inert and therefore reacts to human tissues and/or other naturally occurring human bodily contents adversely affecting patient health;

k. That the mesh material harbors infections that adversely affect human tissues and patient heath;

l. That Defendants' vaginal mesh products migrate from the location of their implantation, adversely affecting tissues and patient health;

m. that the mesh material abrades tissues adversely affecting patient health; and/or

n. That Defendants' vaginal mesh products regularly fail to perform the purpose of their implantation such that the patient requires removal of the device and repeated treatment and surgery.

51. Defendants were under a duty to disclose to Plaintiff and her physicians, the defective nature of the vaginal mesh products, including, but not limited to, the heightened risks of erosion, failure and permanent injury.

52. On or about November 2013, Plaintiff Corey Westgate underwent a surgical procedure during which her physicians implanted the Altis Single Incision Sling into Plaintiff, which was manufactured, marketed and distributed by

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

Defendants.

53.    The Transvaginal Mesh implanted into Plaintiff was designed, manufactured, labeled, tested, advertised, marketed, distributed, and sold by Defendants, in and from Minneapolis, Minnesota, to be used by surgeons throughout the United States, including California, to treat pelvic organ prolapse and stress urinary incontinence and was represented by Defendants to be an appropriate and suitable product for such purpose.

54.    Plaintiff subsequently suffered complications associated with the transvaginal mesh products, including, inter alia, severe pain with daily activities and intercourse.   The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with the Products include, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), urinary dysfunction, blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, and chronic pelvic pain. As a result of these life-altering and, in some cases, permanent injuries, Plaintiff has suffered severe emotional pain and injury and has suffered and will suffer apprehension of increased risk for injuries, infections, pain, mental anguish, discharge, and multiple corrective surgeries as a result of implantation of Defendants' Pelvic Mesh Product.

55.    In many cases, women, including Plaintiff, have been forced to undergo extensive medical treatment including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

56.    As a direct and proximate result of Defendants' conduct and omissions, Plaintiff has suffered, and continues to suffer, multiple, severe and painful personal

16

FIRST AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

injuries, including, but not limited to, urinary incontinence, physical deformity, and the loss of the ability to perform sexually.

## EQUITABLE TOLLING OF APPLICABLE
## STATUTE OF LIMITATIONS

57.     Defendants failed to disclose a known defect and affirmatively misrepresented that Transvaginal Mesh was safe for its intended use.   Further, Defendants actively concealed the true risks associated with the use of Transvaginal Mesh.   Neither Plaintiff nor Plaintiff's prescribing physicians had knowledge that Defendants were engaged in the wrongdoing alleged herein.     Because of Defendants' concealment of and misrepresentations regarding the true risks associated with Transvaginal Mesh, Plaintiff could not have reasonably discovered Defendants' wrongdoing at any time prior to the commencement of this action.

58.     Despite diligent investigation, including consultations with Plaintiff's medical providers, the nature of Plaintiff's injuries and damages and their relationship to the Transvaginal Mesh was not discovered, and through reasonable care and due diligence could not have been discovered until a date within the applicable limitations period for filing Plaintiff's claims.   Plaintiff did not have actual or constructive knowledge of facts indicating to a reasonable person that she was the victim of a tort. Plaintiff was unaware of the facts upon which a cause of action rests until a date within the applicable limitations period for the filing of this action. Plaintiff's lack of knowledge was not willful, negligent or unreasonable.

59.     Thus, because Defendants fraudulently concealed the defective nature of Transvaginal Mesh and the risks associated with its use, the running of any statute of limitations has been tolled.   Likewise, Defendants are estopped from relying on any statute of limitations.

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

**FIRST AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

## CLAIMS FOR RELIEF

## COUNT I

## NEGLIGENCE

60.     Plaintiff incorporates each and every paragraph of this Complaint by reference as if fully stated herein and further states and alleges as follows.

61.     Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertising, supplying, promoting, packaging, sale, and distribution of transvaginal mesh into the stream of commerce, including the duty to assure that the Transvaginal Mesh would not cause users to suffer unreasonable, dangerous side effects and serious health problems.

62.     Defendants failed to exercise ordinary care in the design, research, development, manufacture, marketing, supplying, promoting, advertising, packaging, sale, testing, quality assurance, quality control, and distribution of the Transvaginal Mesh because Defendants knew or had reason to know that using Transvaginal Mesh created a high risk of unreasonable and dangerous side effects, including, but not limited to, severe erosion of the vaginal wall and other tissues, infection, the loss of the ability to perform sexually, death and other severe personal injuries, which are permanent and lasting in nature, including, but not limited to, physical pain and mental anguish, scarring and disfigurement, diminished enjoyment of life, and any and all further medical complications, such as Plaintiff's need for life-long medical treatment and care, and fear of developing further adverse health consequences.

63.     Defendants manufactured, produced, promoted, formulated, created, developed, designed, sold, and distributed transvaginal mesh without thoroughly and adequately testing them.

64.     Defendants manufactured, produced, promoted, advertised, formulated, created, developed, designed, and distributed its transvaginal mesh while concealing

18

1  and suppressing test results.

2      65.   Defendants did not conduct sufficient studies and tests to determine

3  whether its transvaginal mesh were safe for their intended use, because Defendants

4  knew, or should have known, that its transvaginal mesh were unsafe and unfit for

5  use by reason of the dangers to their users.

6      66.   Defendants failed to warn Plaintiff, her physicians and her other

7  healthcare providers, the medical and healthcare community, or the public as soon

8  as Defendants knew, or should have known, that the dangers of the use of

9  Transvaginal Mesh were much higher than the risk of adverse effects from other,

10  safer alternative treatments for pelvic organ prolapse and stress urinary

11  incontinence.

12      67.   Defendants concealed, suppressed, failed to warn about and failed to

13  follow up on, the adverse results of clinical testing which determined that

14  Transvaginal Mesh had a high risk of serious and dangerous adverse health effects

15  and consequences.

16      68.   Defendants failed to provide adequate instructions regarding safety

17  precautions to be observed by users, handlers, and persons who would reasonably

18  and foreseeably come into contact with and, more particularly, use Transvaginal

19  Mesh.

20      69.   Defendants advertised and recommended the use of Transvaginal

21  Mesh, while suppressing and concealing dangers they knew to be inherent in the use

22  of Transvaginal Mesh.

23      70.   Defendants represented that their Transvaginal Mesh was safe for its

24  intended use when Defendants knew, or should have known, that their Transvaginal

25  Mesh was unsafe for its intended use.  Defendants represented that Transvaginal

26  Mesh was just as safe as other treatments for stress urinary incontinence and pelvic

27  organ prolapse when Defendants knew, or should have known, that Transvaginal

28  Mesh had a high risk of serious and dangerous adverse health effects and

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

consequences as a result of which Defendants' transvaginal mesh was not as safe as other treatments for stress urinary incontinence and pelvic organ prolapse;

71.     Defendants suppressed, concealed, and omitted information concerning warnings, recommendations, and observations about Transvaginal Mesh from Plaintiff, her physicians, and her other healthcare providers and from the public, while knowing that Transvaginal Mesh is unsafe and dangerous; and

72.     Defendants suppressed, concealed, omitted, and misrepresented to Plaintiff, her physicians and her other healthcare providers, the medical community, the public, the severity of the risks and the dangers inherent in the intended use of Transvaginal Mesh, as compared to other treatments for stress urinary incontinence and pelvic organ prolapse.

73.     Defendants were negligent in the design, research, development, manufacture, promotion, packaging, advertising, distribution, testing, marketing, and sale of Transvaginal Mesh because:

      a. Defendants failed to use due care in the design, research, manufacture, and development of its transvaginal mesh so as to avoid risks to patients of serious and dangerous adverse health effects and consequences when its transvaginal mesh was used for the treatment of stress urinary incontinence or pelvic organ prolapse;

      b. Defendants failed to design and manufacture its transvaginal mesh so as to minimize the risk of serious side effects, including, but not limited to, the erosion of the vaginal wall and infections; and

      c. Defendants failed to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance, to determine the safety of transvaginal mesh.

      d. While Defendants knew, or should have known, that transvaginal mesh caused unreasonably dangerous side effects, Defendants

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

**FIRST AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

nonetheless continued and still continue to market, manufacture, distribute, advertise, promote, and sell transvaginal mesh to consumers.

e. Defendants knew, or should have known, that consumers such as Plaintiff, into whom transvaginal mesh was implanted, would foreseeably suffer severe injuries as a result of Defendants' failure to exercise ordinary care, as set forth above.

f. Defendants' negligence was the proximate cause of the injuries, harm, and economic loss that Plaintiff has suffered and will continue to suffer in the future.

74. Defendants, at all relevant times knew or, in the exercise of reasonable care, should have known that the Pelvic Mesh Products were of such a nature and were not properly designed, manufactured, labeled, tested, distributed, advertised, marketed, promoted and/or sold with the proper warnings, and were unreasonably likely to injure the Vaginal Mesh Products users.

75. Defendants so negligently and carelessly designed, manufactured, labeled, tested, examined, distributed, advertised, marketed, promoted, sold and/or supplied the Pelvic Mesh Products that they were dangerous and unsafe for the use and purpose for which they were intended.

76. Defendants were aware of the probable consequences of placing the Pelvic Mesh Products into the stream of commerce.

77. Defendants knew, or should have known, the Pelvic Mesh Products would cause serious injury; however, Defendants failed to disclose the known or knowable risks associated with the Pelvic Mesh Products.

78. Defendants willfully and deliberately failed to avoid those consequences, and in doing so, they acted in conscious disregard of the safety of the Plaintiff.

79. Defendants owed a duty to Plaintiff to adequately warn her of the risks

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

1  associated with the Pelvic Mesh Products and the resulting harm and risk they
2  would cause patients.

3      80.    Defendants breached this duty by failing to comply with state and
4  federal regulations concerning the study, testing, design, development, manufacture,
5  inspection, production, advertisement, marketing, promotion, distribution, and/or
6  sale of the Pelvic Mesh Products.

7      81.    As a direct, foreseeable and proximate result of Defendants' aforesaid
8  acts and omissions, and as the direct, foreseeable and proximate result of the
9  implantation of Defendants' transvaginal mesh into Plaintiff, Plaintiff was caused to
10 suffer, did suffer and will continue to suffer from physical, emotional, economic and
11 other injury.

## COUNT II
## STRICT LIABILITY:  FAILURE TO WARN

15     82.    Plaintiff incorporates each and every paragraph of this Complaint by
16 reference as if fully stated herein and further states and alleges as follows.

17     83.    Defendants researched, developed, designed, tested, manufactured,
18 inspected, labeled, distributed, marketed, promoted, sold and otherwise released
19 transvaginal mesh into the stream of commerce within the State of California and
20 elsewhere, and directly advertised and marketed within the State of California and
21 elsewhere, transvaginal mesh to consumers or persons responsible for consumers,
22 and, therefore, had a duty to warn of the risks associated with the use of transvaginal
23 mesh.

24     84.    Defendants' transvaginal mesh was under the exclusive control of
25 Defendants and was not accompanied by adequate warnings regarding adverse side
26 effects and complications associated with the use of transvaginal mesh, or by
27 adequate warnings regarding the comparative severity, duration and extent of the
28 risk of injuries associated with use of transvaginal mesh.

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

85.   Defendants failed to timely and reasonably to warn of material facts regarding the safety and efficacy of transvaginal mesh; no healthcare provider would have prescribed — and no consumer would have used — transvaginal mesh had the facts concerning the safety and efficacy of transvaginal mesh been made known to such healthcare providers and consumers.

86.   Defendants' advertising campaign for transvaginal mesh did *not* advise either consumers or healthcare providers that transvaginal mesh presented multiple and dangerous medical risks, including erosion of the vaginal wall and other tissues, infection, permanent and substantial physical deformity,  the need for additional surgery, the loss of the ability to perform sexually, and other severe and permanent health consequences notwithstanding Defendants' knowledge of an increased risk of injuries and side effects over other forms of treatment for female urinary incontinence and pelvic organ prolapse.

87.   Defendants failed to perform or otherwise facilitate adequate testing; such testing would have demonstrated that transvaginal mesh posed serious and potentially life-threatening side effects and complications with respect to which full and proper warning accurately and fully reflecting the symptoms, scope and severity should have been made to healthcare providers, to the FDA, and to consumers, including Plaintiff.

88.   Transvaginal mesh was defective due to inadequate post-marketing warnings and instructions because, after Defendants knew, or should have known, of the risk of serious and potentially life-threatening side effects and complications from the use of transvaginal mesh, Defendants failed to provide adequate warnings to healthcare providers or to the consuming public, including Plaintiff, and instead continued to advertise and market transvaginal mesh aggressively.

89.   Had Plaintiff or Plaintiff's physician received adequate warnings regarding the risks of the Pelvic Mesh Products, neither she nor her physician would have used them.

90.    As a direct, foreseeable and proximate result of Defendants' foregoing conduct, Plaintiff has suffered and will continue to suffer serious and permanent physical and emotional injuries, has incurred medical expenses, has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally, and economically injured.

## COUNT III

## BREACH OF EXPRESS WARRANTIES

91.    Plaintiff incorporates each and every paragraph of this Complaint by reference as if fully stated herein and further states and alleges as follows.

92.    Defendants expressly warranted that their transvaginal mesh was safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and was adequately tested and fit for its intended use.

93.    At the time of Defendants' aforesaid express warranties, Defendants knew or should have known, that their transvaginal mesh did not conform to these express warranties because their transvaginal mesh was not safe and had numerous serious side effects, about which Defendants did not adequately warn.

94.    As a direct, foreseeable, and proximate result of Defendants' breach of their express warranties, Plaintiff suffered and will continue to suffer severe and permanent personal injuries, harm and economic loss.

95.    Plaintiff relied on Defendants' express warranties with respect to their transvaginal mesh.

96.    Members of the medical community, including Plaintiff's physicians and other healthcare providers, relied upon Defendants' representations and warranties in connection with the use, recommendation, description, and implantation of transvaginal mesh.

97.    Defendants breached the express warranties because their transvaginal mesh was, and is, defective and unreasonably unsafe for its intended use.

98.    Defendants expressly represented to Plaintiff, her physicians and her

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

other healthcare providers that its transvaginal mesh (i) was safe and fit for the purposes intended, (ii) was of merchantable quality, (iii) did not produce any dangerous side effects in excess of those risks associated with other treatments for pelvic organ prolapse and stress urinary incontinence, (iv) the side effects it produced were accurately reflected in the warnings, and (v) it was adequately tested and fit for its intended use.

99.   The Pelvic Mesh Products did not conform to the express representations because they are not safe and have numerous serious risks and side effects. it Defendants knew, or should have known, that their aforesaid representations and warranties were false, misleading, and untrue because its transvaginal mesh was not safe and fit for its intended use, and caused its users serious injuries of which Defendants did not adequately warn.

100.   As a direct, foreseeable and proximate result of Defendants' foregoing acts and omissions, Plaintiff was caused to suffer and did suffer serious and grievous personal injuries, including erosion of the vaginal wall and other tissues, infection, permanent and substantial physical deformity, and the loss of the ability to perform sexually, as well as other grievous personal injuries, including, but not limited to, physical pain and mental anguish, permanently diminished enjoyment of life, and any and all additional life implications and complications, such as Plaintiff's need for life-long medical treatment and medical monitoring, and perpetual fear of developing additional adverse health consequences.

101.   As a direct, foreseeable and proximate result of Defendants' foregoing conduct, Plaintiff has suffered and will continue to suffer serious and permanent physical and emotional injuries, has incurred medical expenses, has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally, and economically injured.

/ / /

/ / /

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

## COUNT IV

## BREACH OF IMPLIED WARRANTIES

102.   Plaintiff incorporates each and every paragraph of this Complaint by reference as if fully stated herein and further states and alleges as follows.

103.   At all relevant times, Defendants manufactured, compounded, portrayed, distributed, recommended, merchandised, advertised, promoted, and sold transvaginal mesh to treat pelvic organ prolapse and stress urinary incontinence.

104.   At the time Defendants marketed, sold, and distributed transvaginal mesh for implantation into Plaintiff, Defendants knew of the intended use of transvaginal mesh, and impliedly warranted transvaginal mesh to be of merchantable quality and safe and fit for such intended use.

105.   Defendants impliedly represented and warranted to Plaintiff, her physicians and other healthcare providers, to the general public, that transvaginal mesh was safe and of merchantable quality and fit for the ordinary purpose for which transvaginal mesh was to be used.

106.   Defendants' representations and warranties were false, misleading, and inaccurate because transvaginal mesh was unsafe, unreasonably dangerous, improper, not of merchantable quality and otherwise defective.

107.   Plaintiff, her physicians and her other healthcare providers relied on Defendants' superior skill and judgment, as to whether transvaginal mesh was of merchantable quality and safe and fit for their intended use, and as to whether transvaginal mesh was fit for this particular use.

108.   Defendants put transvaginal mesh into the stream of commerce within the State of California and elsewhere, in a defective, unsafe, and inherently dangerous condition, and transvaginal mesh was expected by Defendants to and did reach Plaintiff without substantial change in the condition in which transvaginal mesh was sold.

109.   Due to Defendants' wrongful conduct as alleged herein, neither

26

Plaintiff nor her physicians or other healthcare providers could have known about the nature of the risks and side effects associated with the Pelvic Mesh Products until after implanted in Plaintiff.

110.   Defendants breached their implied warranty because transvaginal mesh was not fit for its intended use and purpose.

111.   As a direct, foreseeable and proximate result of Defendants' aforesaid acts and omissions within the State of California, Plaintiff was caused to suffer, and did suffer, serious and dangerous side effects of erosion of the vaginal wall and other tissues, permanent and substantial physical deformity, and the loss of the ability to perform sexually and has undergone or will have to undergo corrective surgeries and may need further corrective surgery. Plaintiff has suffered other grievous personal injuries, including, but not limited to, physical pain and mental anguish, permanently diminished enjoyment of life, and any and all additional life implications and complications, such as Plaintiff's need for life-long medical treatment and care, medical monitoring, and perpetual fear of developing additional adverse health consequences.

112.   As a direct, foreseeable and proximate result of Defendants' foregoing conduct, Plaintiff has suffered and will continue to suffer serious and permanent physical and emotional injuries, has incurred medical expenses, has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally, and economically injured.

**COUNT V**

**COMMON LAW FRAUD**

113.   Plaintiff incorporates each and every paragraph of this Complaint by reference as if fully stated herein and further states and alleges as follows.

114.   Defendants falsely and fraudulently represented to Plaintiff, her physicians and her other healthcare providers, to the medical and healthcare communities, and to the public that transvaginal mesh had been tested and had been

27

determined to be safe and effective to treat pelvic organ prolapse and stress urinary incontinence.

115. When Defendants made their aforesaid representations Defendants knew, or should have known, that those representations were false, and Defendants willfully, wantonly, and recklessly disregarded the falsity of their representations as well as the dangers and health risks to users of transvaginal mesh, including Plaintiff.

116. Defendants made the aforesaid representations with the intent of defrauding and deceiving Plaintiff, her physicians and her other healthcare providers, the medical and healthcare communities, and the public, and to induce Plaintiff, her physicians and her other healthcare providers, the medical and healthcare communities and the public, to recommend, purchase and implant transvaginal mesh to treat pelvic organ prolapse and stress urinary incontinence, all of which evinced a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of plaintiff and other consumers.

117. In representations to Plaintiff, her physicians and her other healthcare providers, Defendants fraudulently concealed and intentionally omitted the following material information:

a. Transvaginal mesh is not as safe as other forms of treatment for pelvic organ prolapse and stress urinary incontinence;

b. The risk of adverse events with transvaginal mesh was not adequately tested and was known by Defendants;

c. Defendants deliberately failed to follow up on the adverse results from clinical studies and buried and misrepresented those results;

d. Defendants were aware at all times of the dangers in transvaginal mesh, in addition to, and above and beyond the risks normally associated with treating pelvic organ prolapse and stress urinary incontinence;

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

28

e. Transvaginal mesh was defective, and caused dangerous and adverse side effects, including, but not limited to, erosion of the vaginal wall and other tissues, infection, permanent and substantial physical deformity, and loss of the ability to perform sexually, at a much more significant rate than other treatments for pelvic organ prolapse and stress urinary incontinence;

f. Patients with transvaginal mesh implanted need to be monitored more regularly than patients treated with other treatments for pelvic organ prolapse and stress urinary incontinence;

g. Transvaginal mesh was manufactured negligently;

h. Transvaginal mesh was manufactured defectively; and

i. Transvaginal mesh was designed negligently and defectively.

118. Defendants had a duty to disclose to Plaintiff, her physicians and her other healthcare providers, the defective nature of transvaginal mesh, including, but not limited to, the fact that transvaginal mesh had heightened risks of dangerous side effects.

119. Defendants had sole access to the facts concerning the defective nature of transvaginal mesh and its propensity to cause serious and dangerous side effects and hence, cause dangerous injuries and damage to persons into whom transvaginal mesh was implanted, including Plaintiff.

120. Defendants' aforesaid concealment and omissions of material fact concerning the safety of transvaginal mesh were made intentionally, willfully, wantonly, and recklessly to mislead, to cause Plaintiff's physicians and her other healthcare providers to purchase and to implant transvaginal mesh, and to mislead Plaintiff into reliance and to cause Plaintiff to permit transvaginal mesh to be implanted into her.

121. At the time that Defendants made these representations, and at the time transvaginal mesh was implanted into Plaintiff, Plaintiff was unaware of the

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

falsehood of Defendants' aforesaid representations, reasonably believed them to be true, and relied upon them.

122.   Defendants knew or should have known that transvaginal mesh could and would cause severe and grievous personal injury to women into whom they were implanted and that transvaginal mesh was inherently dangerous in a manner that exceeded any purported benefit from the use of transvaginal mesh and any warnings gave concerning transvaginal mesh.

123.   In reliance upon Defendants' false representations, Plaintiff was induced to, and did permit transvaginal mesh to be implanted into her, thereby sustaining severe and permanent personal injuries and damages.  Defendants knew, or should have known, that Plaintiff, her physicians and her other healthcare providers had no way to determine that Defendants concealed and omitted facts necessary to make the statements Defendants made about transvaginal mesh true.

124.   Plaintiff, her physicians and her other healthcare providers reasonably relied on Defendants' statements and representations which suppressed and concealed facts that were critical to understanding the dangers inherent in the use of transvaginal mesh.

125.   As a result of Defendants' research, clinical trials, testing or lack thereof, Defendants intentionally distributed false information and made false statements and representations, including, but not limited to, assuring Plaintiff, her physicians, and her other healthcare providers and the public that transvaginal mesh was safe to treat pelvic organ prolapse and stress urinary incontinence.  Defendants intentionally omitted, concealed and suppressed the results of their research, clinical trials and testing from Plaintiff, her physicians and her other healthcare providers and the public.

126.   Defendants had a duty when disseminating information to the public, including Plaintiff, to disseminate truthful information; and Defendants had a parallel duty not to deceive the public, Plaintiff, Plaintiff's physicians and Plaintiff's

30

other healthcare providers.

127.   The information Defendants distributed to Plaintiff, her physicians, and her other healthcare providers, to the public, and to the medical community, included, but was not limited to, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing representations, which were materially false and misleading, and which contained material omissions of the truth about the dangers of the use of transvaginal mesh.

128.   Defendants misrepresented to Plaintiff, her physicians and her other healthcare providers, to the healthcare and medical communities, and to the public, the material facts that transvaginal mesh did not have dangerous or serious adverse health safety concerns, and that transvaginal mesh was as safe as other means of the treatment of pelvic organ prolapse and stress urinary incontinence.

129.   Defendants' intent in making these misrepresentations was to deceive and defraud and to gain the confidence of Plaintiff, her physicians and her other healthcare providers, the medical community, and the public and to induce Plaintiff, her physicians and her other healthcare providers, the healthcare and medical communities, and the public to request, recommend, and implant transvaginal mesh into patients, including Plaintiff.

130.   Defendants made claims and representations in reports to the public and to healthcare professionals and in advertisements that transvaginal mesh did not present serious health risks.

131.   Defendants' aforesaid representations were knowingly false when made or were made recklessly and without regard to the true facts.

132.   Defendants' aforesaid representations were made with the intention of deceiving and defrauding Plaintiff, her physicians and her other healthcare providers and other members of the healthcare and medical communities, were made in order to induce Plaintiff, her physicians and her other healthcare providers to dispense,

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

1  recommend, and implant transvaginal mesh into Plaintiff.

2      133.  Defendants intentionally concealed, omitted and misrepresented the

3  dangerous and serious health and safety concerns inherent in the use of transvaginal

4  mesh for the purpose of influencing the sales of a product known to Defendants to

5  be dangerous and defective, and certainly not as safe as other alternatives for

6  treating pelvic organ prolapse and stress urinary incontinence.

7      134.  Defendants willfully and intentionally failed to disclose the truth, failed

8  to disclose material facts and made false representations, for the purpose of

9  deceiving Plaintiff, her physicians and her other healthcare providers, into a false

10 sense of security, to induce Plaintiff's physicians and other healthcare providers to

11 recommend, dispense, and implant transvaginal mesh into Plaintiff, and to induce

12 Plaintiff to permit transvaginal mesh to be implanted into her.

13      135.  Plaintiff and her healthcare providers relied to their detriment on

14 Defendants' misrepresentations and omissions.  Had Plaintiff known the truth about

15 the dangers and serious health and safety risks of transvaginal mesh, Plaintiff would

16 not have permitted transvaginal mesh to be implanted into her.

17      136.  Defendants' fraud and deceit was perpetrated willfully, wantonly, and

18 purposefully on Plaintiff.

19      137.  As a direct, foreseeable and proximate result of Defendants' aforesaid

20 acts and omissions Plaintiff was caused to suffer, and did suffer, the serious and

21 dangerous side effects of erosion of the vaginal wall and other tissues, permanent

22 and substantial physical deformity and loss of the ability to perform sexually, has

23 undergone corrective surgeries and will likely require further corrective surgery, and

24 suffered further grievous personal injuries, including, but not limited to, physical

25 pain and mental anguish, permanently diminished enjoyment of life, and any and all

26 additional life implications and complications, such as Plaintiff's need for life-long

27 medical treatment and care, medical monitoring and perpetual fear of developing

28 additional adverse health consequences.

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

138.   As a direct, foreseeable and proximate result of Defendants' foregoing conduct, Plaintiff has suffered and will continue to suffer serious and permanent physical and emotional injuries, has incurred medical expenses, has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally, and economically injured.

## COUNT VI

## NEGLIGENT MISREPRESENTATION

139.   Plaintiff incorporates each and every paragraph of this Complaint by reference as if fully stated herein and further states and alleges as follows.

140.   Defendants had the duty to accurately and truthfully represent to the medical and healthcare communities, to Plaintiff, her physicians and her other healthcare providers, and to the public, that transvaginal mesh had been tested and had been determined to be safe and effective for treating pelvic organ prolapse and stress urinary incontinence.  Defendants' representations of safety and effectiveness of transvaginal mesh were false.

141.   Defendants failed to exercise ordinary care in their representations concerning transvaginal mesh because Defendants negligently concealed, omitted and misrepresented transvaginal mesh' high risk of unreasonable, dangerous, adverse side effects.

142.   Defendants knew, or should have known, that transvaginal mesh had been insufficiently tested, or had not been tested at all, lacked adequate and accurate warnings, and created a high risk, or higher than acceptable risk, or higher than reported and represented risk, of adverse side effects, including, but not limited to, erosion of the vaginal wall and other tissues, infection, permanent and substantial physical deformity, and loss of the ability to perform sexually.

143.   As a direct, foreseeable and proximate result of Defendants' wrongful acts and omissions, Plaintiff has suffered and will continue to suffer serious and permanent physical and emotional injuries, has incurred medical expenses, has

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

1  suffered and will continue to suffer economic loss, and has otherwise been

2  physically, emotionally, and economically injured.

3  **COUNT VII**

4  **VIOLATION OF APPLICABLE STATE CONSUMER FRAUD &**

5  **DECEPTIVE TRADE PRACTICES LAWS**

6  144.  Plaintiff re-alleges the allegations contained in the foregoing

7  paragraphs.

8  145.  Defendants have a statutory duty to refrain from unfair or deceptive

9  acts or practices in the design, development, manufacture, promotion and sale of the

10  defective products.  Had the Defendants not engaged in the deceptive conduct

11  described herein, Plaintiff would not have purchased and/or paid for the defective

12  product referenced herein, and would not have incurred related medical costs and

13  injury.

14  146.  Defendants engaged in wrongful conduct while at the same time

15  obtaining, under false pretenses, substantial sums of money from Plaintiff for the

16  defective product that would not have been paid had Defendants not engaged in

17  unfair and deceptive conduct.

18  147.  Plaintiff was injured by the cumulative and indivisible nature of

19  Defendants' conduct.  The cumulative effect of Defendants' conduct directed at

20  patients, physicians and consumers was to create demand for and sell the defective

21  product.  Each aspect of Defendants' conduct combined to artificially create sales of

22  the defective product.

23  148.  Defendants are liable to Plaintiff jointly and severally for all general,

24  special and injunctive relief to which Plaintiff is entitled by law.  Under statutes

25  enacted in California to protect consumers against unfair, deceptive, fraudulent and

26  unconscionable trade and business practices and false advertising, Plaintiff is a

27  consumer who purchased Defendants' pelvic mesh product pursuant to a consumer

28  transaction for personal use and is therefore subject to protection under such

legislation.

149.   Under statutes enacted in California to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, Defendants are the supplier, manufacturer, advertiser, and seller, who is subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

150.   Defendants violated the statutes enacted in California to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that the Pelvic Mesh product was fit to be used for the purpose for which it was intended, when in fact the Pelvic Mesh product was defective and dangerous.

151.   The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under the statutes enacted in California to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

152.   Defendants had actual knowledge of the defective and dangerous condition of the Pelvic Mesh product, and failed to take any action to cure such defective and dangerous conditions.

153.   Plaintiff and the medical community relied upon Defendants' misrepresentations and omissions in determining which Pelvic Mesh product and/or produce to utilize.

154.   Defendants' deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff, constituted unfair and deceptive acts and practices in violation California Business and Professional Code § 17200, et. seq. and California Business & Professional Code § 17500, et. seq. and or other applicable statutes.

155.   By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiff has suffered ascertainable loss and

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

1   damages.

2      156.   As a direct and proximate result of Defendants' violations of California

3   Business and Professional Code § 17200, et. seq. and California Business &

4   Professional Code § 17500, et. seq. and or other applicable statutes.  Plaintiff has

5   sustained economic losses and other damages and is entitled to statutory,

6   compensatory, injunctive and declaratory relief in an amount to be proven at trial.

7

8                        **PRAYER FOR RELIEF**

9      **WHEREFORE,** Plaintiff prays for relief against Defendants, jointly and

10   severally, as follows:

11      1.   Compensatory damages according to proof and in an amount to fully

12           compensate Plaintiff for all of her injuries and damages, both past and

13           present;

14      2.   Special damages according to proof and in an amount to fully

15           compensate Plaintiff for all of her injuries and damages, both past and

16           present, including but not limited to, past and future medical expenses,

17           costs for past and future rehabilitation and/or home health care, lost

18           income, permanent disability, including, permanent instability and loss

19           of balance, and pain and suffering;

20      3.   All other damages as allowed by law;

21      4.   Restitutionary disgorgement; and

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California

**FIRST AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

5. Such further relief as this Court deems necessary, just, and proper.

DATED: July 19, 2018

Respectfully submitted,

**KIESEL LAW LLP**

By: _____/s/ Melanie Meneses Palmer_____
Paul R. Kiesel
Melanie Meneses Palmer

Attorneys for Plaintiff
Corey Westgate

## <u>JURY DEMAND</u>

Plaintiff hereby demands trial by jury to the full extent permitted by law.

DATED: July 19, 2018

Respectfully submitted,

**KIESEL LAW LLP**

By: _____/s/ Melanie Meneses Palmer_____
Paul R. Kiesel
Melanie Meneses Palmer

Attorneys for Plaintiff
Corey Westgate

**FIRST AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 19, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 19, 2018, at Beverly Hills, California.

Respectfully submitted,

**KIESEL LAW LLP**

By: _____/s/ Melanie Meneses Palmer_____
Melanie Meneses Palmer
  *palmer@kiesel.law*
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel:   310-854-4444
Fax:   310-854-0812

KIESEL LAW LLP
Attorneys at Law
Beverly Hills, California